OPINION
{¶ 1} The defendant-appellant, David W. Benson, appeals the judgment and sentence of the Marion County Court of Common Pleas finding him guilty of one count of abduction, in violation of R.C. 2905.02(A)(2).
 {¶ 2} Benson owned and operated a tattoo parlor in Marion, Ohio when he first met Amanda Patton. Soon thereafter, Benson and Patton started dating, and in March or April 2002, Patton moved into Benson's residence.
 {¶ 3} While living together, Patton alleged that Benson controlled all of the couple's money, which included a monthly welfare check and various other checks she received from random employment. Moreover, Patton also alleged that Benson kept the money as well as a supply of marijuana in a safe in their house.
 {¶ 4} On December 25, 2003, Patton's family went to Benson's house to exchange Christmas gifts. After everyone left the house in the evening, including Benson to run an errand, Patton decided to take Benson's safe and move out of the house. Patton asked Lori Addis,[1] Jeannie Powell, and Powell's boyfriend, Keith Miller to assist in her getaway. With everyone's assistance, Patton loaded the safe and her belongings into Miller's car and drove to Miller and Powell's house.
 {¶ 5} The safe was unloaded into the backyard, where Patton and Powell used a power saw and a sledgehammer to open it. Inside the safe, the girls found approximately three to four thousand dollars and marijuana.
 {¶ 6} Meanwhile, Benson returned to his house and found Patton's belongings and his safe missing. Benson immediately phoned the police to report that his safe was allegedly stolen. After explaining the situation to the police, the police informed Benson that because he and Patton were living together the problem was not criminal, but civil, in nature; therefore, the police stated that they could not file a police report or get involved. Subsequently, Benson began searching for Patton and his money.
 {¶ 7} The next day, on December 26, 2003, Patton, Addis, and Heather Layne took the money from the safe and Patton bought a used car for $680. She also rented a hotel room for a month for approximately $600. Once they took some clothes and belongings to the hotel, they left to go shopping at the mall. At the same time, Benson enlisted Thomas Patton, Amanda's brother, to help him find Amanda.
 {¶ 8} On their way to the mall, Patton's car was stopped at a red light at the intersection of Greenwood Street and Church Street, which was a two lane road, adjacent to the Marion Public Library. There were cars in front of her and behind her. Benson and Thomas Patton, who happened to be driving the opposite direction, drove past Patton, Layne and Addis. Immediately after passing them, Benson recognized Patton as the driver and stopped his vehicle. Addis stated at trial:
A. Okay, what's he do with his vehicle? He stopped his vehicleright at the end of ours and jumped out of the car.
 Q. When you say right at the end of yours, what do you mean bythat?
 A. He didn't really see it at first. He looked over and saw and slammedon his brake and stopped so like his car back end was probably like thisfar onto our back of the car, wasn't on it, but that far blocking theback of the car. (Indicated.)
 Q. Okay. So you had your hands apart maybe like three feet?
Id. at 325.
 {¶ 9} Benson immediately exited the car, which blocked the flow of traffic in the other direction, and approached Patton's vehicle. Addis testified:
Q. Now, he got out of his car and you said you did what?
 A. I locked my door.
 Q. Why did you lock your door?
 A. `Cause I got scared from what Amanda told me. I thought he was goingto try hurting me.
 Q. And when did you first see this blackjack in his hand?
 A. Uh, I didn't see it until after he had broke the window when he camethrough the window. He hit — he like accidentally hit [the driver sidewindow]. I don't know if he purposely, but when he broke the window, hehit her on the head with [the blackjack].
 Q. Okay. He hit who, he hit who on the head?
 A. Amanda.
Id. at 326.
 {¶ 10} Benson reached his hand through the broken driver side window and pulled the keys out of the ignition. At the same time, Benson repeatedly kept yelling that he "wanted his money," but Patton denied having it. Finally, Patton told Benson that his money was in the trunk of vehicle, so Benson ran around to the back of the vehicle to open the truck. Once Benson moved towards the trunk, Patton and Layne exited the vehicle and ran towards the library.
 {¶ 11} Patton and Layne entered the library and ran towards the circulation desk. Patton informed the librarian to call the police, so the librarian called 911. Immediately thereafter, Benson entered the library demanding that Patton return his money. In an attempt to avoid Benson, Patton and Layne ran behind the circulation desk, but Benson continued to demand that Patton return his money. The record indicates that at no time during this altercation did Benson threaten Patton, Addis, or Layne. Finally, Patton gave Benson approximately $1000, and Benson left the library. Benson also retained Patton's car keys, which had the hotel room key attached to it.
 {¶ 12} Patton was taken to the hospital and treated for her head wound injury. She subsequently returned to her rented hotel room and found the entire room was empty. Her clothing, photos, and food were gone.
 {¶ 13} Benson was arrested, and a grand jury indicted Benson on one count of felonious assault, in violation of R.C. 2903.11(A)(2); three counts of abduction for each individual in the vehicle, in violation of R.C. 2905.02(A)(2); one count of possession of marijuana, in violation of R.C. 2925.11(A)(C)(3); and two counts of tampering with evidence, in violation of R.C. 2923.12(A)(1). Benson plead not guilty to all counts, and jury trial commenced on June 9, 2004.
 {¶ 14} On June 14, 2004, the jury found Benson guilty of one count of abduction as alleged in Count Two of the indictment. Benson appeals alleging five assignments of error. For the sake of judicial economy, the first two assignments will be discussed together.
 First and Second Assignments of Error THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORTDEFENDANT-APPELLANT'S CONVICTION FOR ABDUCTION.
 DEFENDANT-APPELLANT'S CONVICTION FOR ABDUCTION IS CONTRARY TO THEMANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 15} In these assignments of error, Benson argues that the State failed to produce sufficient evidence to sustain a conviction for abduction, as alleged in Count Two of the Indictment. Specifically, Benson alleges that there is insufficient evidence that Benson possessed the requisite mens rea to support his conviction. Second, Benson contends that the State failed to prove that Benson restrained Patton's liberty when he approached the car on the street demanding his money. Third, Benson argues that Benson had a privilege to restrain Patton's liberty in order to get back his safe. Finally, Benson alleges the same arguments in support of his claims that the conviction is against the manifest weight of the evidence.
 {¶ 16} In State v. Jenks, the Ohio Supreme Court set forth the sufficiency of the evidence test as follows:
An appellate court's function when reviewing the sufficiency of theevidence to support a criminal conviction is to examine the evidenceadmitted at trial and determine whether such evidence, if believed, wouldconvince the average mind of the defendant's guilt beyond a reasonabledoubt. The relevant inquiry is whether, after viewing the evidence in alight most favorable to the prosecution, any rational trier of fact couldhave found the essential elements of the crime proven beyond a reasonabledoubt.
 State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. In contrast, when reviewing whether a verdict is against the manifest weight of the evidence, this Court must review the entire record, consider the credibility of witnesses, and determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.
 {¶ 17} Benson was convicted for abduction as alleged in Count Two of the Indictment. Count Two reads:
On 12/12/03 at approximately 3:41 p.m., at E. Church Street andGreenwood Street, Marion, Ohio, Defendant did, without privilege to doso, knowingly restrain the liberty of Amanda Patton by blocking the pathof her vehicle with his car, smashing the driver's side window out,hitting her head and threatening her with a blackjack, creating physicalharm . . . and placing her in fear.
Bill of Particulars. R.C. 2905.02 defines abduction as the following:
No person, without privilege to do so, shall knowingly . . . [b]y forceor threat, restrain the liberty of another person, under circumstanceswhich create a risk of physical harm to the victim, or place the otherperson in fear.
R.C. 2905.02(A)(2). "Knowingly," as stated within the abduction definition, is defined as:
[a person acting] regardless of his purpose, when he is aware that hisconduct will probably cause a certain result or will probably be of acertain nature. A person has knowledge of circumstances when he is awarethat such circumstances probably exist.
R.C. 2901.22(B). Finally, "`[p]rivilege' means an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12).
 {¶ 18} Turning to the case before us, we conclude that Benson's restraint of Patton's liberty, even assuming he had a limited privilege to do so to attempt to recover money stolen from him, was done in an excessive manner. Specifically, we conclude that viewing the evidence in a light most favorable to the State, any rationale trier of fact would have found the manner in which Benson restrained Patton's liberty unreasonable. Moreover, we cannot conclude that, given Benson's excessive and violent actions, an abduction conviction was a miscarriage of justice. Primarily, we highlight Benson's use of a blackjack that resulted in breaking the driver side window of Patton's vehicle and injuring her.
 {¶ 19} After reviewing the other two arguments outlined in these assignments of error — i.e. Benson lacked the requisite mens rea and Benson did not significantly restrain Patton's liberty, we conclude that they also lack merit. First, the testimony reflects that Benson approached Patton's driver side door and demanded that she return his money. Given the circumstances surrounding Benson's actions at the vehicle, we conclude he "knew" that he was restricting Patton's liberty because (1) Benson was standing directly in front of the door; (2) there was someone sitting in the passenger seat; (3) there were cars parked in front of her and in back of her; and (4) Benson reached into the car and removed the keys from the ignition.
 {¶ 20} In sum, viewing the evidence stated, supra, in a light most favorable to the State, any rationale trier of fact could have found that Benson "knowingly" abducted Patton. Furthermore, any rationale trier of fact could have found significant restraint on Patton's liberty. Furthermore, based on this same evidence, the jury did not clearly lose its way, nor was there a miscarriage of justice. Accordingly, the first and second assignments of error are overruled.
 Third Assignment of Error The trial court erred to the prejudice of Defendant-Appellant byadmitting state's exhibit 7(A).
 {¶ 21} As part of the State's case that Benson knowingly, by force or threat, restrained Patton's liberty under circumstances that placed Patton in fear, the State introduced Exhibit 7(A), an upper body picture of Benson, as evidence of Benson physical size at the time of the incident. Benson objected claiming that the picture displayed his heavily tattooed body and caused him prejudice.
 {¶ 22} Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Even if evidence is relevant, "evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." Evid.R. 403(A). A trial court has broad discretion when admitting evidence, and that discretion will not be disturbed absent an abuse of discretion. State v. Myers, 97 Ohio St.3d 335,348, 2002-ohio-6658, at ¶ 75. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, unconscionable, or arbitrary. Id.
 {¶ 23} In order for the State to prove abduction as alleged in Count Two of the indictment, the State must prove beyond a reasonable doubt that Benson restrained Patton's liberty under circumstances that placed Patton in fear. Accordingly, it is not arbitrary, unreasonable, or unconscionable for the trial court to admit the State's photograph of Benson to show the jury the size of the defendant at the time of the incident.[2] Moreover, because Benson has tattoos covering his body, including his neck and arms, which the jury could see during the trial, and there was testimony that Patton met Benson when Benson owned a tattoo parlor, it was not an abuse of discretion for the trial court to admit this photograph even though it showed some of Benson's tattoos. Thus, the third assignment of error is overruled.
 Fourth Assignment of Error Prosecutorial Misconduct rendered Defendant-Appellant's trialfundamentally unfair in violation of the constitutions of ohio and theUnited States.
 {¶ 24} In this assignment of error, Benson alleges that the prosecutor engaged in prejudicial and inappropriate misconduct. Specifically, Benson highlights statements that the prosecutor made during opening and closing arguments. During opening argument, Benson suggests the following statements were prejudicial because he was not on trial for abuse or intimidation:
[Prosecutor:] Thank you, Your Honor. * * * We'll prove to you beyondany reasonable doubt that this Defendant, David Benson, engaged in apattern of intimidation.
 [Defense Counsel:] I would like to object.
 [Prosecutor:] — of Amanda Patton
 [Defense Counsel:] Characterization of Evidence.
 {¶ 25} [Prosecutor:] Preview of evidence that's going to takeplace.
Whitmer Trial Tr. at p. 28. Furthermore, during closing argument, Benson points out several statements made by the prosecutor that Benson alleges were either "appealing to the emotions of the jury" or discrediting his defense counsel. The prosecutor stated:
[Prosecutor:] Sometimes teenagers think they're in love. Things don'tgo well. Maybe there's abuse, maybe there's control. Maybe the one partythinks that's normal.
 I think, you know, from your common experience, that these things arecomplicated and people go back together and victims put up with thingsthey shouldn't put up with in relationships. And there's a combination offeelings of fear and love. Particularly people that don't have a lotgoing for `em in their lives.
 You know, Amanda's a young girl, didn't get very far in school. Motherpassed away. I mean, she's literally living on her own at a too youngage.
 You know, as you look at the case you kind of need to put yourself insome respects in the shoes of Amanda and Heather and Lori. Not to agreewith some decisions they've made, but you understand their situation.
* * *
I have listened to [defense counsel] for 56 minutes, and on the 56thminute he said something I agree with. I'm an advocate. I'm an advocatefor justice. I have served as the Prosecuting Attorney in this county for20 years. I have tried a lot of cases. And every case that's tried, atthe end of the case the defense attorney stands up and says "Oh, there'sa reasonable doubt, there's a reasonable doubt, there's a reasonabledoubt."
 My duty, my obligation, my interest is to seek justice. We have plentyof cases to handle without looking for cases that shouldn't beprosecuted.
* * *
You know, [defense counsel] wants you to believe that his client isMr. Wonderful, and in private when no one's looking, yet in public, inbroad daylight he will smash out a car window at a busy intersection. .. . * * *
 You have probably all had experiences where friends of your maybe gotdivorced and you thought "Gee, I didn't know there was a problem."
 Probably all had experiences where abuse took place that you never knewabout and still don't know about. We can't put our blinders on and thinkthat doesn't happen.
* * *
Now, [defense counsel], I mean, this is how far he has to go to try tocreate reasonable doubt in this case. He said — and he stood here beforeyou and said, "Amanda Patton was not hit in the head". [sic] The fact hesays it doesn't make it evidence. In fact, it's directly contrary to theevidence.
Layne Trial Tr. at pp. 426-27; 488-90; 492.
 {¶ 26} In regards to alleged prosecutorial misconduct in opening and closing arguments, we have previously stated:
At the outset it must be remembered that considerable latitude ispermitted during [opening and] closing argument. The standard forprosecutorial misconduct during [opening and] closing argument is whetherthe remarks were improper, and if so, whether they prejudicially affectedthe substantial rights of the accused. As we stated in State v. Coffman,this inquiry is guided by four factors: (1) the nature of the remarks,(2) whether an objection was made by counsel, (3) whether correctiveinstructions were given by the court, and (4) the strength of evidenceagainst the defendant. Further, we must also be mindful of the generalmaxim that prosecutorial misconduct is not grounds for reversal unless itso taints the proceedings that it deprives the defendant of a fairtrial.
 State v. Johns, 3rd Dist. Nos. 13-04-23, 13-04-24, 13-04-25, 2005-Ohio-1694, at ¶ 25 (internal citations and quotations omitted).
 {¶ 27} After reviewing the record and the specific statements that Benson suggests constitutes prosecutorial misconduct, we conclude that (1) given the fact that Benson was charged with abduction, discussing "intimidation" could be deemed proper to establish that Patton was placed in fear as alleged in the indictment;[3] (2) discussing "justice" or telling the jury that the State is "seeking justice" was not improper; (3) and rebutting the defense counsel's characteristic that Benson was a "good" guy, which implied that he would never do anything alleged in the indictment, was also proper. In sum, therefore, Benson's fourth assignment of error is overruled.
 Fifth Assignment of Error The combination of the aforementioned errors are sufficient to callinto question the validity of the verdict, preventing the appellant fromobtaining the fair trial guarenteed by the fifth an sixth amendments tothe U.S. Constitution as made applicable to the states by thefourteenth amendment, and article one, sections ten and sixteen of the ohioconstitution.
 {¶ 28} In the fifth assignment of error, Benson alleges the doctrine of cumulative error. In State v. DeMarco (1987), 31 Ohio St.3d 191,509 N.E.2d 1256, paragraph two of the syllabus, the Ohio Supreme Court stated, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." After reviewing the record and the appeals alleged before us, we conclude that this doctrine is not applicable. See State v. Garner (1995), 74 Ohio St.3d 49, 64,656 N.E.2d 623; State v. Davis (1991), 62 Ohio St.3d 326, 348,581 N.E.2d 1362. Accordingly, the fifth assignment of error is overruled.
Judgment Affirmed.
 Cupp, P.J., and Bryant, J., concur.
[1] The record indicates that Addis recently moved into Benson's house.
[2] The record reflects that the photographs were taken on the day of the crime.
[3] We also note that this was the only prosecutorial statement that was objected to by defense counsel.