**[Cite as *State v. Stein*, 2021-Ohio-761.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No. L-19-1171

     Appellee                                     Trial Court No. CR0201801882

v.

Brandon Stein                                    **DECISION AND JUDGMENT**

     Appellant                                    Decided:  March 12, 2021

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Drew E. Wood, Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**OSOWIK, J.**

### Introduction

{¶ 1} Following a jury trial, the defendant-appellant, Brandon Stein, was

convicted in the Lucas County Court of Common Pleas of complicity to commit

abduction, with a corresponding gun specification, and sentenced to serve six years in

prison. On appeal, appellant challenges the legal sufficiency and weight of the evidence as well as his sentence. Finding no error, we affirm.

## Background

{¶ 2} This case involves the shooting death of "D.B." by Lonzo Rivers on November 20, 2017, in the parking lot of the Stop and Go gas station on Spencer Street and South Avenue in Toledo. The shooting occurred in the middle of the day, at 2:30 p.m., when Rivers approached the victim's parked car, on foot, as appellant and two other individuals prevented the victim from escaping by "boxing" him in, from their respective vehicles.

{¶ 3} On May 18, 2018, appellant was indicted for the following offenses: aggravated murder, in violation of R.C. 2903.01(B) and (F), an unspecified felony (Count 1); murder, in violation of R.C. 2903.02(B) and 2929.02, an unspecified felony (Count 2); aggravated robbery, in violation of R.C. 2911.01(A)(1) and (C), a felony of the first degree (Count 3); and kidnapping, in violation of R.C. 2905.01(B)(2) and (C), a felony of the first degree (Count 4). Each count included a gun specification under R.C. 2941.145(A), (B), (C) and (F). Also named in the indictment were the shooter, Lonzo Rivers, and the two other drivers, Daniel Matney and Mark E. Diebert.

{¶ 4} Appellant was tried individually before a jury over the course of five days, beginning on March 4, 2019. At trial, the state called nine witnesses. First, the state called Toledo Police Officer Mark Johnson. Johnson recovered a video from the Stop & Go surveillance system, which recorded the November 20, 2017 shooting. The outdoor

2.

camera used by Stop and Go was described as a "fisheye camera" that allows the operator to "scan to different [areas] with a 360 [degree] view." The six-minute video was admitted into evidence and played for the jury.

{¶ 5} In the first half of the video, three vehicles come into view. Appellant—who arrived first in a white SUV—initially parked at the Stop and Go but then crossed Spencer Street and parked in the lot of an auto shop. Within moments, a red truck, driven by Mark Diebert, and a gold sedan, driven by Danny Matney, also arrived at the auto shop. All of the vehicles parked so as to face the Stop and Go.

{¶ 6} At the three-minute mark, the camera picks up a person, later identified as Rivers, walking along South Avenue, towards the Stop and Go. Rivers traverses the property, toward a blue garbage can on the perimeter of the lot, near the curb that abuts Spencer Street. Rivers can be seen tipping the garbage can slightly and placing an object underneath it. He then walks away, toward the entrance of the Stop and Go. As he does, a fourth car—a Nissan Altima driven by the victim—appears cutting through the auto shop parking lot, crossing Spencer Street, pulling into the Stop and Go lot and stopping alongside the garbage can.

{¶ 7} At the 4:18 mark of the video, appellant's SUV begins to move toward the Stop and Go, and within seconds, all three cars are seen moving "at a pretty rapid rate" and crossing Spencer Street toward the Altima. Meanwhile, Rivers—rather than walking inside the store—turns around and returns. As he approaches, the Altima pulls forward, toward the oncoming gold sedan driven by Matney. The Altima stops. As it does, the

3.

three cars "close in" on it. The gold sedan pulls up to the front end of the Altima; the red truck jumps the curb and parks at an angle, alongside the Altima, and appellant—in the white SUV— "pull[s] in at a sharp angle, lock[s] his brakes up, and block[s] the rear exit of [the victim's] vehicle." At the 4:35 mark, Rivers can be seen firing a gun into the passenger-side window of the Altima. The Altima backs up, clips appellant's SUV causing the SUV to rock, but the Altima continues in reverse until it smashes into another object. Rivers catches up to the passenger-side door and reaches for it, but the car speeds off down Spencer Street. At the 4:45 mark, the Altima—with its back bumper dragging in the street and blown out passenger window—disappears from view.

{¶ 8} Over the next thirty seconds, Rivers is seen running away, down South Avenue. And, Diebert in his red truck and Matney in his gold sedan drive off in separate directions. Only appellant remains. In the last minute of the video, appellant can be seen getting in and out of his vehicle, twice, and pacing around the Stop and Go parking lot, before speeding off, down Spencer Street, in the direction of the Altima.

{¶ 9} Toledo Police Patrolman Anthony Waldon and his partner were the first officers on-scene after the shooting. According to Officer Waldron, the victim crashed his car into a building, "not too far" from where the shooting occurred. The victim was non-responsive with "very shallow breathing." Later that day, the victim was pronounced dead at the hospital. According to Lucas County Deputy Coroner, Jeffrey Hudson, M.D., the victim was shot twice, once in abdomen and once in the chest.

4.

{¶ 10} Other witnesses at trial testified as to a potential motive. On the morning of the shooting, Lonzo Rivers filed an in-person criminal complaint at the Safety Building downtown. Rivers reported that "somebody was trying to scam money from him [by] saying they had videos of him * * * doing inappropriate sexual things." The blackmailer was threatening to post the videos on-line if Rivers did not "drop" money at certain locations. Rivers told the clerk working at the front desk that he had already provided two payments, and he identified the blackmailer as driving a black Nissan Altima. He also provided a license plate number. As he was exiting the building, Rivers made a similar report to Officer Amy Shaner and asked to speak to a detective. During that conversation, Rivers "pointed to a [most-wanted] board and said if [he] didn't talk to somebody, he was going to be on that board."

{¶ 11} The victim's older sister, Kelsey Rogers, testified that she last saw her brother on the day of the shooting at her home. When the victim left, around 1:40 p.m., he asked to borrow her phone, and she agreed. After the shooting, the phone was recovered by police in the Altima. Rogers also testified that the Altima had been loaned to her brother by "D.N." who was described as the victim's "on-and-off boyfriend."

{¶ 12} The lead investigator, Detective Jeffery Clark, interviewed appellant three times. The first interview took place on the day of the shooting, after appellant approached the police at the location of the victim's car crash. Appellant identified himself as a witness, and the police asked him to come to the Safety Building to be interviewed. At that interview, appellant failed to admit his involvement in the shooting

5.

or to identify Rivers, Matney, or Diebert. He also provided an inaccurate description of the events leading up to the shooting. But, because Detective Clark had not yet seen the surveillance video, he had no reason to doubt appellant or to believe that the unidentified shooter had any accomplices.

{¶ 13} Detective Clark "definitely" considered appellant a suspect once he saw the Stop and Go surveillance video, specifically the footage of appellant's white SUV "boxing [the victim] in." At trial, Detective Clark testified that the movements of appellant, Rivers, Matney and Diebert resembled a police "takedown," which is a coordinated vehicle maneuver used by police to surround and trap a suspect-vehicle while another officer, on foot, approaches the suspect and arrests him.

{¶ 14} The police quickly identified Rivers as the shooter once the Altima license plate number was entered into the police computer system, and a match was made between the shooting incident and the criminal complaint filed by Rivers.

{¶ 15} At Detective Clark's request, appellant appeared at the safety building for a second interview on December 1, 2017, ten days after the shooting. As the interview began, appellant volunteered that he had seen "on the news" that a warrant had been issued in the case, and that it was "funny" that he "knew that dude." Appellant identified "that dude" as Lonzo Rivers. During the interview, appellant told Detective Clark that he was at the auto shop to "count his change." Detective Clark interviewed appellant a third time on May 14, 2018, just days before he was indicted. That time, appellant claimed that he was at the auto shop to speak to an employee there.

6.

{¶ 16} Detective Clark identified text messages between the phone found in the victim's possession—belonging to his sister—and the phone registered to Rivers. In the 30 minutes preceding the shooting, the messages indicate that the two planned to exchange money for the alleged DVD at the Stop and Go. According to those messages, the victim directed Rivers to "start walking" toward "a blue garbage can" and "put the money * * * under there." Another message directed Rivers to go inside the store after dropping the money and "wen u come out [the DVD] will be underthere." The last message, at 2:28 p.m., is from Rivers. It indicates that he's "bout to now" place the envelope under the trash can. According to Detective Clark, a DVD was recovered in the victim's car after the shooting, but it was "a children's movie," and the bank envelope that police recovered from beneath the garbage can was stuffed with newspaper clippings.

{¶ 17} Detective Clark testified extensively about his review of phone logs for each of the codefendants and provided the following summary: "We were able to establish that the four people that we've been talking about had all been in communication, maybe not directly one with the other, but there was a connection between the four of them where phone calls were placed prior to the shooting and after the shooting." For example, seven minutes before the shooting and again right after, Lonzo Rivers called Mark Diebert. And, appellant called Matney at "approximately the same time" that he exited the Stop and Go parking lot and "reposition[ed] himself" at the auto shop, perhaps—as Detective Clark testified—to "inquire as to where the others

7.

were." After the shooting, appellant received a call from Mark Diebert and placed two outgoing calls back to him.

{¶ 18} At the conclusion of the state's case, appellant moved for an acquittal as to all charges, pursuant to Crim.R. 29, which was denied by the trial court.

{¶ 19} During his case-in-chief, appellant presented excerpts of testimony given by Rivers in another proceeding, and the state then offered additional excerpts. In that proceeding, Rivers testified that, after he filed a criminal report at the Safety Building, he visited Mark Diebert, at Diebert's workplace, and told him that he was being blackmailed. He then visited appellant, at appellant's home, and told him the same thing. Danny Matney was also there. Rivers testified that he "asked [appellant to] come up to the gas station * * * just to have my back." Appellant agreed, and he "left at the same time [Rivers] left." Rivers had his gun with him at the time. As Rivers began walking to the Stop and Go, he called Diebert to ask him to "go to the gas station." Rivers maintained that "there was never a plan for them to block [the victim] in or anything," and he insisted that he "just asked them to come up there."

{¶ 20} At the conclusion of the trial, the jury found appellant guilty of complicity to commit abduction, in violation of R.C. 2905.02(A)(2), a felony of the third degree, a lesser included offense of Count 4, and the corresponding gun specification under R.C. 2941.145(A), (B), (C) and (F). The jury found appellant not guilty of Counts 1, 2 and 3, including the firearm specifications attached to each of those counts. The trial court sentenced appellant to serve 36 months in prison for the abduction offense, plus a

8.

mandatory and consecutive term of three years for the gun specification, pursuant to R.C. 2929.14(C)(1)(a), and three years of mandatory postrelease control. The trial court also imposed various costs and ordered that he make restitution. Appellant appealed and assigns the following assignments of error for our review:

I. The evidence presented at trial was insufficient to support a conviction for Complicity to Commit Abduction.

II. The Jury's finding of guilty for Complicity to Commit Abduction was against the manifest weight of the evidence.

III. The Jury's finding of guilty for the Firearm Specification was against the manifest weight of the evidence.

IV. The Trial Court erred when it failed to direct a verdict in favor of Appellant.

V. The Trial Court abused its discretion in the imposition of Appellant's sentence given the evidence brought forth at trial.

### The complicity to commit abduction offense

{¶ 21} We consider appellant's first, second, and fourth assignments of error together. "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency

9.

of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 22} Appellant was convicted of complicity to commit abduction, a violation of R.C. 2905.02(A)(2), which provides that,

> No person, without privilege to do so, shall knowingly do any of the following: * * * [b] force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear; * * *

{¶ 23} At trial, the state argued that appellant was complicit in committing that offense, specifically by aiding and abetting Rivers, Matney and Diebert. The complicity statute provides, in relevant part, that, "[n]o person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). To support a conviction for complicity by aiding and abetting "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such

intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus.

{¶ 24} On appeal, appellant argues that the state failed to prove a "shared criminal intent * * * between himself and Rivers" to abduct the victim. But, as discussed, the state argued that appellant, in committing abduction, "acted in complicity" *not just* "with Lonzo Rivers" *but also with* "Daniel Matney and Mark Diebert." (Tr. at 153). "[T]he identity of the principal is not an element that the state much prove to establish the offense of complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2)." *In re T.K.*, 109 Ohio St. 3d 512, 2006-Ohio-3056, 849 N.E.2d 286, ¶ 14 ("[T]he juvenile court's inability to identify the principal did not prevent it from finding the appellant delinquent on the two counts of felonious assault.").

{¶ 25} "[C]riminal intent [of complicity by aiding and abetting] can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed." *Johnson* at 245. In other words, the elements of aiding and abetting another in the commission of a crime may be demonstrated by both direct and circumstantial evidence. *In re Williams*, 3d Dist. Marion No. 9-10-64, 2011-Ohio-4338, ¶ 20.

{¶ 26} Here, appellant highlights evidence showing that, before the shooting, there was "only one" phone call between himself and Matney and "no phone calls" between himself and Diebert. He concludes that "one phone call" is insufficient to establish

11.

shared criminal intent to abduct the victim, especially in light of other evidence that Rivers "never directed appellant to restrain or trap or even interact with" the victim.

{¶ 27} But, as the state correctly notes, a sufficiency of the evidence analysis requires that the evidence be viewed in the light most favorable *to the state*. Here, the state put forth ample evidence, direct and circumstantial, establishing that appellant aided and abetted his codefendants in the victim's abduction. That evidence consisted of testimony that (1) appellant met with Rivers and Matney immediately before the incident; (2) that, during their meeting, Rivers asked appellant to "come up to the gas station" and "watch [his] back"; and (3) that Rivers and appellant then exited appellant's home "at the same time." Surveillance video showed appellant arriving at the Stop and Go soon thereafter, "repositioning" himself across the street, after he had placed a brief call to Matney. Of course, the most critical piece of evidence establishing appellant's guilt is the footage showing all four converging—in unison—on all sides of the victim's car: Matney in the front, Diebert on the driver-side, Rivers—armed with a gun—on the passenger-side, and appellant on the back-side. When it was over, appellant made a flurry of calls to Diebert and later lied to the police. In short, we find sufficient evidence that appellant aided and abetted his co-defendants in the commission of the offense based upon his conduct before, during, and after it occurred.

{¶ 28} Next, appellant argues that the state failed to present sufficient evidence that he "restrained [the victim's] liberty."

12.

{¶ 29} "Restraint of liberty" means "to limit one's freedom of movement in any fashion for any period of time." (Citations omitted.) *State v. Worrell*, 10th Dist. Franklin No. 04AP-410, 2005-Ohio-1521, ¶ 53, *rev'd in part on other grounds in In re Ohio Criminal Sentencing Statutes Cases*, 109 Ohio St. 3d 313, 2006-Ohio-2109, 847 N.E.2d 1174, ¶ 53 (Defendant restrained his wife's liberty when he "held her by the hair to prevent her from leaving.").

{¶ 30} Appellant claims that his actions cannot be construed to have "restrained" the victim's liberty because he merely "pulled alongside" the victim's vehicle, leaving "more than enough room" for the victim to back up and pull away and because he "did not chase after" the victim to prevent him from leaving.

{¶ 31} But, the state presented evidence that appellant pulled into the parking lot at "an aggressive pace" and "hit the brakes pretty hard" in an area of the lot that was neither a designated parking space nor in front of a gas pump. Moreover, Detective Clark specifically testified that appellant "blocked the rear exit of [the victim's] vehicle." His testimony is supported by the surveillance video showing that the two vehicles actually collided. And, the force of the collision was significant enough to cause visible damage to the back quarter panel of the Altima and to cause appellant's SUV to move sideways. "[E]ven a momentary restraint may qualify as an abduction if it produces the required risk of physical harm to or fear in the victim." *State v. Willis*, 12th Dist. Butler No. CA2002-02-028, 2002-Ohio-6303, ¶ 12 (Sufficient evidence of restraint shown where victim testified that defendant "grabbed her and dragged her into some bushes * * * for

13.

only a brief period of time.").  In a factually-similar case, where a defendant "stood directly in front of" the driver's side door of the victim's car and there was "someone sitting in the passenger seat, and there were cars parked in front of, and behind the victim's car," the restraint of liberty element was met.  *State v. Benson*, 3d District Marion No. 9-04-45, 2005-Ohio-2245, ¶ 19-20.  *See also State v. Kleybort*, 8th Dist. Cuyahoga No.  81350, 2003-Ohio-1162, ¶ 36 (Conviction affirmed where the evidence showed that the defendant "acted in concert with a group of individuals to prevent [victim] from escaping [the] residence.").  In sum, we find that the state presented legally sufficient evidence that appellant restrained the victim's liberty.

{¶ 32} We cannot conclude that appellant's conviction is against the sufficiency of the evidence.  Although the mere presence of an accused at the scene of a crime is not sufficient to prove that appellant is guilty of the offense, the evidence presented in this case clearly reflects that appellant was an active participant in the commission of the offense, and his conviction accurately reflects this point.  *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982).  Accordingly, we find appellant's first and fourth assignments of error not well-taken.

{¶ 33} In his second assignment of error, appellant argues that the abduction conviction was against the manifest weight of the evidence.

{¶ 34} Under a manifest weight standard, an appellate court must sit as a "thirteenth juror" and may disagree with the fact-finder's resolution of the conflicting testimony.  *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.  The appellate court,

14.

"'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'" *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 35} Appellant claims that, in reviewing the evidence, this court would "struggle to find" any evidence "as to [his] criminal intent * * * related to the crimes committed by Rivers." Our review is limited to the offense for which appellant was convicted, i.e., complicity to commit abduction, and not those of which he was acquitted, i.e., aggravated murder, felony murder, and aggravated robbery. As for his culpability for that offense, appellant argues that he "did not go to the parking lot with the directive to restrain [the victim's] vehicle or person." But, even if the offense was not premeditated, the jury found that, once appellant and his codefendants were assembled there, they acted in concert to abduct the victim and that appellant was an active participant in that abduction. Based upon his conduct before and during the offense, we cannot find that the jury lost its way in reaching that conclusion. As for appellant's conduct *after* the shooting, which included "remaining on the scene" and "voluntarily" speaking to the police, the jury may have been less forgiving of appellant as he is of himself and instead concluded that appellant's failure to provide the police any meaningful information helped an armed

15.

gunman evade capture and is further evidence of appellant's culpability. For these reasons, we find that the conviction is not against the manifest weight of the evidence, and therefore, appellant's second assignment of error is not well-taken.

### The firearm specification

{¶ 36} In his third assignment of error, appellant argues that the firearm conviction was also against the manifest weight of the evidence. Appellant was convicted under R.C. 2941.145 which provides for a mandatory three-year sentencing enhancement when "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶ 37} Appellant argues that the facts "in no way" indicate that he had a weapon on him or under his control and that the firearm in Rivers' possession cannot be imputed to him.

{¶ 38} "[A]n accomplice to a crime is subject to the same prosecution and punishment as the principal offender under R.C. 2923.03(F)." *State v. Tuggle*, 6th Dist. Lucas No. L-09-1317, 2010-Ohio-4162, ¶ 138, citing *State v. Jackson*, 169 Ohio App.3d 440, 2006-Ohio-6059, 863 N.E.2d 223, ¶ 32 (6th Dist.), and *State v. Hanning*, 89 Ohio St.3d 86, 92, 728 N.E.2d 1059 (2000). In *State v. Chapman*, 21 Ohio St.3d 41, 487 N.E.2d 566 (1986), the Supreme Court of Ohio held that an individual convicted of aggravated robbery and of a firearm specification was subject to the then-applicable sentencing enhancement "regardless of whether he or she was the principal offender or an

16.

unarmed accomplice." *Id.* at syllabus. The rule announced in *Chapman* has been extended to other offenses, including abduction. *See State v. Hudson*, 2d Dist. Clark No. 09-CA-01, 2010-Ohio-839, ¶ 8-9.

{¶ 39} Appellant argues that *Chapman* does not apply because he was "not acting in concert with Rivers," an argument that we have already rejected. We are equally unpersuaded by appellant's claim that he "remained in his vehicle the entire time," given that it was his vehicle that was used as the instrumentality of his offense. Finally, the fact that he may not have "kn[own] [that] Rivers had a firearm on him" is "immaterial." *Hudson* at ¶ 9. That is, because the victim was shot twice during the course of the abduction and appellant was complicit in committing that offense, he is subject to the mandatory three-year term of incarceration, even if he was unarmed during the commission of the offense. Accordingly, appellant was properly convicted of the firearm specification, and his third assignment of error is found not well-taken.

## Sentencing

{¶ 40} In his fifth and final assignment of error, appellant argues that the trial court "abused its discretion" in imposing appellant's prison sentence.

{¶ 41} We do not review felony sentences under an abuse of discretion standard. Rather, we review felony sentences pursuant to R.C. 2953.08(G)(2), which provides that,

> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate

17.

court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶ 42} Appellant does not raise any challenge with respect to R.C. 2953.08(G)(2)(a). We, therefore, limit our discussion to R.C. 2953.08(G)(2)(b): whether the sentence is otherwise contrary to law. A sentence is not clearly and convincingly "contrary to law" where the trial court expressly states that it has considered the purposes and principles of sentencing in R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12, properly applies postrelease control, and imposes a sentence within the statutory range. *State v. Tammerine*, 6th Dist. Lucas No. L-13-1081, 2014-Ohio-425, ¶ 15, citing *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶ 18. Recently, the Ohio Supreme Court elaborated that R.C. 2953.08(G)(2)(b) "does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12." *State v. Jones*, Slip Opinion No. 2020-Ohio-6729, ¶ 27; R.C. 2953.08(G)(2)(a).

18.

{¶ 43} A third-degree abduction offense is subject to sentencing under R.C. 2929.14(A)(3)(b), which provides for "a definite [prison] term of nine, twelve, eighteen, twenty-four, thirty, or thirty-six months." "[T]he trial court ha[s] full discretion to impose any sentence within the authorized statutory range * * *." (Quotation omitted.) *State v. Miller*, 6th Dist. Lucas No. L-19-1100, 2020-Ohio-1159, ¶ 9. Nevertheless, when exercising its sentencing discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and 2929.12. *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

{¶ 44} Here, appellant does not allege that the trial court imposed a sentence outside of the applicable sentencing range or erred in imposing a mandatory three-year term of postrelease control. Instead, appellant argues that imposition of a maximum sentence of 36 months "does not comport with * * * the principles and purposes of sentencing." He claims that he "presents little danger to the community" and that the community is "more effectively served" by sentencing him to community service rather than "costing the taxpayers even more money."

{¶ 45} R.C. 2929.11 explains that "[t]he overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." It instructs that "[t]o achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from

19.

future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both."

{¶ 46} R.C. 2929.12 provides discretion to the trial court "to determine the most effective way to comply with the purposes and principles of sentencing * * *." It requires that "[i]n exercising that discretion, the court shall consider the factors set forth in divisions (B) and (C) * * * relating to the seriousness of the conduct, the factors provided in divisions (D) and (E) * * * relating to the likelihood of the offender's recidivism, and the factors set forth in division (F) * * * pertaining to the offender's service in the armed forces of the United States," in addition to any other factors relevant to achieving the purposes and principles of sentencing. R.C. 2929.12(A).

{¶ 47} A sentencing court is not required to explain its reasons for imposing a maximum sentence. *State v. Pippin*, 6th Dist. Lucas No. L-18-1023, 2019-Ohio-1387, ¶ 17. Likewise, a sentencing court is also not required "to use language or make specific findings to demonstrate that it considered the applicable sentencing criteria under" R.C. 2929.12. *State v. Green*, 6th Dist. Lucas No. L-18-1065, 2019-Ohio-1816, ¶ 10. A trial court's statement that it considered R.C. 2929.12 is sufficient. *State v. Harris*, 6th Dist. Wood No. WD-18-077, 2019-Ohio-4711, ¶ 8. In fact, even where the court fails to specifically state that it considered R.C. 2929.12, we will presume that it did. *Id.*

{¶ 48} The trial court's March 27, 2019 judgment expressly states that it "considered the record, oral statements, any victim impact statement and presentence report prepared, as well as the *principles and purposes of sentencing under R.C. 2929.11,*

*and has balanced the seriousness, recidivism and other relevant factors under R.C. 2929.12.*" (Emphasis added.) Moreover, at the sentencing hearing, the trial court explained the rationale for its sentence:

[T]here are consequences for your actions. Someone was killed. I find that this is the worst form of the offense. * * * Now let's talk about your record. * * * When I review your juvenile record, * * * you were adjudicated [for] domestic violence [and for] purchasing of a gun [and] for selling a firearm. * * * [Y]ou are projecting yourself to be * * * a good Samaritan [who] just went to help a friend and [who doesn't] mess with guns. See, that doesn't square. You've been to [jail] apparently. As I look at your adult record, you were charged with failure to obey a police officer [which] was amended to a misdemeanor [for] failure to obey. You were convicted of such in 2000. You were initially charged [with] theft [which was] reduced to unauthorized use.

So, Mr. Stein, you have had contact with the criminal justice system, and I suspect throughout the criminal justice system, again, you know right and you know wrong. Th[e] [victim's] family is going to be affected for the rest of their lives. Because of your actions and the actions of your friend, you will affect generations of this family. * * *

This Court, again, indicates that given the loss of life, the facts and circumstances surrounding this case, that this is the worst form of the

offense, and as a result of the worst form of the offense, this Court believes and feels that a maximum sentence is appropriate.

{¶ 49} "[I]t is up to the discretion of the individual decision-maker 'to determine the weight to assign a particular statutory factor.'" *State v. Yeager*, 6th Dist. Sandusky No. S-15-025, 2016-Ohio-4759, ¶ 13, quoting *State v. Arnett*, 88 Ohio St.3d 208, 215, 724 N.E.2d 793 (2000). Here, the court may have weighed certain factors more heavily than others, but we cannot say that it did not consider the principles and purposes of sentencing or the seriousness and recidivism factors as it was required to do under R.C. 2929.11 and 2929.12. Given that the court considered these factors, properly applied postrelease control, and imposed a sentence within the statutory range, we cannot say that the sentence was contrary to law.

{¶ 50} Appellant also claims that the three-year sentence for the firearm specification "is not supported by the evidence." We have already addressed, and rejected, appellant's challenge to the underlying merits of the firearm specification. Pursuant to R.C. 2929.14(C)(1)(a), the additional three-year prison term for the firearm specification must be served "consecutively to and prior to any prison term imposed for the underlying felony." The trial court's imposition of that term was proper.

{¶ 51} For these reasons, we find appellant's fifth assignment of error not well-taken.

22.

**Conclusion**

**{¶ 52}** We affirm the March 27, 2019 judgment of the Lucas County Court of

Common Pleas.  Appellant is responsible for the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.