[Cite as *State v. Pitts*, 2022-Ohio-643.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

State of Ohio                                        Court of Appeals No. OT-21-019

      Appellee                               Trial Court No. CP NO 20 CR 014

v.

Jeremiah J. Pitts                                    **DECISION AND JUDGMENT**

      Appellant                              Decided:  March 4, 2022

* * * * *

James J. VanEerten, Ottawa County Prosecuting Attorney, and
Blake W. Skilliter, Assistant Prosecuting Attorney, for appellees

W. Alex Smith, for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** This case is before the court on appeal by appellant, Jeremiah Pitts, from the

June 22, 2021 judgment of the Ottawa County Common Pleas Court.  For the reasons that

follow, we affirm.

**Assignments of Error**

I.   Pitts was convicted against the manifest weight of the evidence.

II.  Evidence was admitted against Evid.R. 404(B).

**Background**

{¶ 2} In January of 2020, appellant was indicted on one count of corrupting another with drugs in violation of R.C. 2925.02(A)(3)(C)(1)(a), a felony of the second degree (Count One) and one count of involuntary manslaughter in violation of R.C. 2903.04(A)(C), a felony of the first degree (Count Two). These charges stemmed from the death of Melissa Manns, who died on August 27, 2019. The parties have stipulated that her death was caused by a fatal overdose of fentanyl that she ingested on or about August 26 – 27, 2019.

{¶ 3} A jury trial was held beginning on April 13, 2021. At trial, the following relevant testimony was set forth.

{¶ 4} The first witness to testify was Miranda Heuberger, appellant's live-in girlfriend at the time in question. Heuberger detailed the timeline of events of August 26, 2019, including testifying to a number of communications between both Manns and appellant and Manns and Heuberger that occurred throughout the day. Heuberger explained that she communicated through Facebook messenger and, as she did not have service on her cell phone, her communications were limited to times she had Wi-Fi, or if she accessed her Facebook account on appellant's phone.

2.

{¶ 5} Manns first contacted appellant on Facebook at around 10:00 a.m. asking for $100 worth of drugs. At this time, both appellant and Heuberger were working together doing odd jobs. When appellant did not respond, Manns contacted Heuberger who also did not reply right away. Appellant then answered Manns around 10:45 a.m. that he had "hard," which Heuberger testified meant crack. When Manns replied "not hard," which, according to Heuberger meant Manns wanted heroin or fentanyl, appellant responded that he could get it "after work." Manns responded "Text me." After hours of no communication between appellant and Manns, Manns reached out to Heuberger around 4:17 p.m. with "got $$$." Heuberger explained this meant Manns was still trying to get drugs and was reaching out to Heuberger because appellant had not messaged her back regarding the drugs. Manns then sent a message to appellant around 6:11 p.m. which was followed by a 53 second Facebook call between appellant and Manns. Then at 6:27 p.m., Manns sent messages to appellant saying "if u ever want pills…I got a hookup in Toledo[]" and "I can't get there…sooo."

{¶ 6} After finishing work for the day, appellant and Heuberger drove to Toledo in a grey truck owned by appellant. The purpose of the trip was for Heuberger to visit her father; however, Heuberger testified that appellant left her at her father's house for a period to get more drugs.

{¶ 7} Messages renewed between appellant and Manns around 8:18 p.m. when Manns texted "Anything?" to appellant. He responded "yeah" and "in few." A conversation continued between appellant and Manns where it appears appellant was negotiating to either purchase pills from Manns or trade Manns drugs for the pills as well

3.

as money.  After a back and forth regarding a price for Manns' pills which did not result in any agreement, Manns messaged appellant "when u b here with the good shit?"  When he replied that it would be two hours, Manns wrote "Just bring me some shit, asshole!!!"  Appellant responded, in part, that he would be there.  Manns then told appellant to call her when he got there, not to honk his horn.

{¶ 8} At 8:19 p.m., Manns sent a message to Heuberger asking her what she was doing and if she was o.k.

{¶ 9} Manns again reached out to appellant at 9:10 p.m. asking where he was.  He responded that he was "coming" and that he would text her.  After missed calls back and forth, at approximately 9:11 p.m. to 9:12 p.m. there was a video chat between appellant and Manns.  Manns then texted appellant "Come save me."  Appellant responded "I'll b there soon."

{¶ 10} Manns messaged appellant again at 10:41 p.m. "Come on now."  And at 10:55 p.m. she wrote "R u coming?"  At 11:22 p.m., a number of Facebook messages were sent from appellant's phone.  First was "I'm home u ready" to which Manns responded yes and then "How long."  When appellant replied with "soon," Manns sent back "How soon asshole…I want 50 of each."  Heuberger testified she understood this to mean Manns wanted "50 of crack and a 50 of heroin" or some kind of opiate.  The next message from appellant's phone was from Heuberger who first stated that "This is Miranda" and then "we are on our way to u love."  Heuberger explained that she was texting at this point as appellant was driving.  Another message from appellant's phone, which Heuberger admitted to sending said "Couple minutes."

4.

{¶ 11} At 11:23 p.m., Heuberger attempted to make a Facebook call to Manns using appellant's phone. Manns did not answer. At 11:24 p.m., there were a series of messages from Heuberger to Manns which said "hello," then "love" then "answer UR phone." A minute later, there was a 14 second Facebook call, initiated by Heuberger between Heuberger and Manns in which, according to Heuberger, she told Manns she was on her way. There was also a message from Heuberger telling Manns "Yes we are just [g]ot the stuff," followed by another message "At home leaving [now]." Heuberger then asks Manns "Will u do a bump wit me if i[] come girl?" and when Manns answers in the affirmative, Heuberger says "Thank u I really need it." Manns responds to Heuberger "kk. bring 50 of each." At 11:49 p.m., there was a five second call from appellant to Manns during which, according to Heuberger, appellant said "come outside." At this time, appellant and Heuberger were at Manns' residence.

{¶ 12} Manns then came outside. According to Heuberger, Manns first argued with appellant, telling him he better be treating Heuberger right and taking care of her. She then got into the rear seat on the passenger side of the truck. Heuberger saw Manns give appellant money and appellant give Manns "a piece of paper" "[l]ike a fold." Heuberger explained it was common for drugs to be packaged in such a way. Heuberger further stated that, despite Manns' agreement to give her "a bump," appellant told Manns not to and instead appellant later gave Heuberger heroin. Manns was only in the truck for a few minutes.

5.

{¶ 13} After leaving Manns' house, appellant tried on two occasions to video chat with Manns at 12:20 a.m. and 12:21 a.m. He then sent her a message at 12:21 a.m. which said "hello."

{¶ 14} Heuberger also reached out to Manns. At 12:34 a.m., she sent texts stating "Thank u love," "And sorry about him," which she clarified was in reference to appellant for arguing, "Trippin hate that shit" which Heuberger also said was about the arguing and fighting, and "But thank you for looking out for me for bringing that to you." This last statement, according to Heuberger, was in reference to Manns giving her weed to take home. Manns did not respond to these messages.

{¶ 15} Heuberger also testified that she had entered into an agreement with the prosecutor whereby the prosecutor agreed not to prosecute her for any drug abuse charges relating to August 26 and 27, 2019, and in exchange she would truthfully testify in appellant's trial.

{¶ 16} In response to suggestions by defense counsel that it was she that provided the drugs to Manns, Heuberger testified that she did not supply drugs, but appellant did and she had been present when appellant sold drugs to other people.

{¶ 17} As to the events that took place after Manns received the drugs, the parties have stipulated to a summary of statements made by Rex Lacer, who was letting Manns

6.

live on his property.[1]  At approximately 1:05 a.m., Manns came into Lacer's home and shortly thereafter, she collapsed.  Lacer then called 911.  He was not aware of Manns' whereabouts prior to her entering the house.

{¶ 18} In addition to Heuberger, other pertinent testimony included testimony by Brian Potts, an officer with the United States Customs and Border Protection, who testified that video from the Erie Ottawa Airport showed a truck driving into a driveway at approximately 11:48 p.m. on August 26, 2019.  Matt Gandee, a commander of the drug task force in Ottawa County, also testified regarding conversations appellant had on Facebook with others that were indicative of drug trafficking.  In some of the conversations, appellant was attempting to trade one form of drug for another.  Trevor Johnson, from the Ottawa County Prosecutor's Office testified concerning the Facebook messages sent between Manns and appellant and Heuberger and Manns.  He further testified regarding videos from security cameras located at a nearby airport and a customs office showing a truck he recognized as appellant's pulling into a driveway on the property where Manns lived at approximately 11:49 p.m., and leaving six to eight minutes later.  Johnson also stated that Manns "did not communicate with anybody else once she received her drugs" and that, while reviewing the videos, he did not see anyone

---

[1] With regard to where on the property Manns was staying, on the morning of August 27, 2019, Lacer stated that she was sleeping on his couch while Manns and her boyfriend "got their camper ready to live in" and in another conversation a few days later, Lacer stated that he allowed Manns and her boyfriend to move their camper onto his property and that Manns' boyfriend was in jail and Manns was living "at the property."

7.

else coming and/or going from Lacer's property between the time the truck left and the emergency vehicles arrived.

{¶ 19} At the conclusion of the trial, appellant was found guilty of both charges. On June 21, 2021, appellant was sentenced. The court merged the two counts and the state elected to proceed on the involuntary manslaughter count. Appellant was sentenced to a minimum prison term of 10 to 15 years. The sentencing judgment entry reflecting this sentence was journalized on June 22, 2021. Appellant appealed.

**Analysis**

{¶ 20} In his first assignment of error, appellant argues that his convictions were against the manifest weight of the evidence.

{¶ 21} When considering whether a conviction was against the manifest weight of the evidence, an appellate court "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The reviewing court sits "as a 'thirteenth juror' and may disagree with the fact-finder's resolution of the conflicting testimony." *State v. Stein*, 6th Dist. Lucas No. L-19-1171, 2021-Ohio-761, ¶ 34, citing *Thompkins* at 387. However, we will "extend special deference to the jury's credibility

8.

determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Beavogui*, 6th Dist. Wood No. WD-17-009, 2018-Ohio-2432, ¶ 55.

{¶ 22} Here appellant argues that there was no evidence presented to show that appellant provided the drugs to Manns and that it was those drugs that killed her. He maintains that "no evidence was presented to show that [appellant] himself provided drugs to the victim." Instead, he argues the evidence supports a finding that Heuberger was the person that supplied the drugs to Manns. Alternatively, appellant points to an hour before EMS was called in which there was no evidence regarding Manns' activities. Because of the "multiple alternatives," appellant argues that there is no evidence that Manns died of drugs provided by appellant or Heuberger.

{¶ 23} We find there is evidence to support appellant's convictions and we cannot find that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. The parties agree that Manns died of a drug overdose. The evidence shows hours of documented back and forth messages between Manns and appellant regarding appellant getting drugs for Manns. These communications were initiated by Manns, who specifically reached out to appellant for drugs. There is then a video of appellant's truck driving to Manns' residence at the time Heuberger testifies they were there, and testimony by Heuberger that she witnessed appellant give a folded piece of paper, which was consistent with the manner in which opiates were packaged, to Manns in exchange for money an hour prior

9.

to Manns' death. There is additionally no evidence that Manns reached out to any other person to purchase drugs on the day in question, or any evidence that Manns was in contact with anyone else between the time appellant and Heuberger left Manns' residence and the time Manns entered Lacer's home. Moreover, appellant's argument that Heuberger was the one who gave the drugs to Manns would not absolve appellant of liability. The jury was charged that appellant could be liable as either the principal offender or a complicitor. Even if it was Heuberger who actually gave Manns the drugs that killed her, there is sufficient evidence in the record to support a finding that appellant was complicit. One who is complicit in the commission of an offense can be charged and punished as a principal offender. R.C. 2923.03(F). Accordingly, we find appellant's first assignment of error not well-taken.

{¶ 24} In his second assignment of error, appellant contends that the trial court erred by admitting evidence that appellant had provided drugs to people other than Manns.

{¶ 25} Evidence that a person committed a crime other than that for which he or she is on trial is not admissible solely to show that person's propensity or inclination to commit crime, or that that person acted in conformity with bad character. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15. However, Evid.R. 404(B) allows such evidence to be admitted for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

10.

**{¶ 26}** The Ohio Supreme Court has set forth the following test for determining whether other acts evidence is admissible.

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *Williams* at ¶ 20.

**{¶ 27}** Appellant claims the admission of this evidence was "horribly prejudicial" and "would have swayed the mind of the jurors." The state maintains that the evidence was properly admitted for the purpose of establishing the identity of the person that supplied the opiates to Manns after appellant raised the possibility that it was Heuberger who provided Manns with the drugs. Specifically, the state argues that appellant used the same "modus operandi" with Manns that he did with other drug transactions – he communicated through Facebook Messenger. The state also contends that if the evidence was improperly admitted, the error was harmless as there is still other "overwhelming evidence" in the record to support the convictions.

11.

{¶ 28} We find that we need not decide whether the evidence was properly admitted because even if it was improper, we find any error to be harmless.

{¶ 29} The admission of improper character evidence under Evid.R. 404(B) may be deemed harmless error. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 15. Under harmless error analysis, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). "The term 'substantial rights' has been interpreted to require that 'the error must have been prejudicial.'" *Morris* at ¶ 23, quoting *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7. When determining whether a defendant has been prejudiced by the admission of improper evidence, the court should consider both the impact that the offending evidence had on the verdict as well as the strength of the remaining evidence. *Morris* at ¶ 25, 33. If, upon removal of the tainted evidence, the remaining evidence is overwhelming, an improper admission of evidence under Evid.R. 404(B) may be deemed harmless error. *Id.* at ¶ 32.

{¶ 30} Here, we have reviewed the record and we do not find that appellant was prejudiced by the admission of the evidence of the other drug transactions. We find that the impact that the evidence had on the verdict was low and that the other evidence presented at trial establishes overwhelming evidence of appellant's guilt such that any alleged error was harmless. As discussed above, in addition to Heuberger's testimony that it was appellant who provided Manns with drugs, the evidence establishes that it was appellant who Manns initially reached out to for drugs, there were repeated communications between Manns and appellant's Facebook account regarding the drug

12.

transaction, and appellant's vehicle was at Manns' residence approximately an hour before she overdosed. Additionally, there is no evidence that Manns reached out to anyone other than appellant and Heuberger. Even if the jury were to believe that it was Heuberger and not appellant who provided the drugs, there is overwhelming evidence that appellant was, at a minimum, complicit in the transaction.

{¶ 31} Accordingly, we find appellant's second assignment of error not well-taken.

{¶ 32} The judgment of the Ottawa County Common Pleas Court is affirmed. Pursuant to App.R. 24, appellant is hereby ordered to pay the costs incurred on appeal.

Judgment affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                                                     _____
JUDGE

Christine E. Mayle, J.        

Myron C. Duhart, P.J.                                                  _____
CONCUR.                                                             JUDGE


                                                             _____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.