[Cite as *State v. Rochester*, 2024-Ohio-5306.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No.  WM-23-012 |
| Appellee | Trial Court No.  23 CR 018 |
| v. | |
| Michael C. Rochester | **DECISION AND JUDGMENT** |
| Appellant | Decided:   November 1, 2024 |

* * * * *

Katherine J. Zartman, Williams County Prosecuting Attorney
and Nicholas C. Fee, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Michael C. Rochester, appeals his conviction and sentence entered by the Williams County Court of Common Pleas following the jury's verdict of guilty on a single count of failure to comply with order or signal of police officer and a single count of driving under suspension. For the reasons that follow, the trial court's judgment is affirmed.

## Statement of the Case

{¶ 2} On March 21, 2023, the Williams County Grand Jury issued an indictment charging appellant with two offenses arising out of a February 24, 2023 police chase: Count One charged appellant with Failure to Comply with Order or Signal of a Police Officer in violation of R.C. 2921.331(B),(C)(5)(a)(ii), a felony of the third degree; and Count Two charged him with Driving Under Suspension in violation of R.C. 4510.11(A), (D)(1), a misdemeanor of the first degree.

{¶ 3} Following a two-day jury trial, held on July 12 and July 13, 2023, the jury found appellant guilty on both counts. At appellant's sentencing hearing, held on August 14, 2023, the trial court merged the convictions for purposes of sentencing and imposed a prison term of 30 months on the charge of failing to comply.

## Statement of the Facts

### Trial

### State's Case-in-Chief

{¶ 4} At trial, the State of Ohio called three witnesses, who testified as follows.

### Officer Ricardo Amador

{¶ 5} Bryan Police Officer Ricardo Amador testified that at some point in the days prior to the February 24, 2023 high-speed chase, he saw appellant driving the same vehicle that he later saw appellant driving during the chase. Following this earlier sighting, but prior to the high-speed chase, Amador ran the plates on the vehicle, which came back as being registered to a Judy Rochester. Amador conducted a search of the last

2.

name "Rochester" in the police database and found "prior dealings" with appellant. A background investigation into appellant showed that he had an arrest warrant for a parole violation out of Defiance County, and he had multiple license suspensions and multiple failures to reinstate.

{¶ 6} On February 24, 2023, while Amador was patrolling on the east side of Bryan, Ohio, he observed appellant's truck, a Silver 1500 Ram, parked at a known drug house. Amador continued to patrol the area. He drove past appellant's parked truck a second time, at which point he observed appellant getting into the driver's seat of the vehicle. Knowing appellant was about to leave the house, Amador drove around the block. When he arrived back at the property, he saw that appellant's vehicle had just left and was heading westbound.

{¶ 7} Amador followed appellant's vehicle and ran the vehicle's license plate, which again came back as being registered to Judy Rochester. The plate was also registered to a silver Equinox, and not to the silver/gray Dodge Ram 1500 that appellant was operating. Amador also confirmed through LEADS that appellant was under an OVI suspension and did not have a valid driver's license.

{¶ 8} Still within the city limits, Amador activated his lights at the intersection of East Maple and South Main Streets. Shortly thereafter, appellant turned into a nearby parking lot and then accelerated through an alleyway. Amador called dispatch to advise that appellant was not stopping and he followed as appellant drove through numerous

3.

intersections, running stop signs and stop lights, making multiple marked lane violations, and weaving in and out of lanes.

{¶ 9} Amador was able to identify appellant as the driver of the vehicle -- first when he observed appellant get into the driver's seat of the vehicle and, later, when he observed appellant through appellant's rear-view and side-view mirrors during the pursuit. Amador described appellant as having "very distinctive characteristics," such as tattoos on his head and above his eyebrows, a buzz cut, and a white beard. Amador did not observe a passenger in appellant's vehicle.

{¶ 10} After traveling through Bryan, Amador pursued appellant out of the city limits onto State Route 15. Speeds went from 80 to 120 miles per hour, and from State Route 15, appellant drove into a field and crossed over to get onto County Road F. From there, Amador followed appellant over multiple back roads -- at one point relying on the hand signals of an unnamed driver, who indicated where appellant had turned -- until they reached Blakeslee, Ohio. Once in Blakeslee, witness Gary Merschdorf waived his arms and directed Amador toward a parking lot, where Amador sighted appellant's vehicle once again.

{¶ 11} Upon pulling into the parking lot, Amador observed appellant's vehicle in a parking space, with nobody inside. Amador thought appellant might have run to the nearby railroad tracks, and so he decided to run in that direction. Spotting appellant as he ran behind a house, Amador caught up to him and ordered him to stop. When appellant ignored these orders, Amador pulled out his taser and initiated an arc warning. Together

4.

with Sergeant Mason Hammon, who had just arrived on the scene, Amador was then able to get appellant to the ground and put him in handcuffs.

{¶ 12} The majority of the high-speed pursuit was recorded on Amador's dash camera, and a copy of the recording was admitted into evidence. Amador estimated appellant's speeds to have been in excess of 100 miles per hour outside of the Bryan city limits, where the speed limits were 55 miles per hour or less. Within the city limits, appellant, still speeding, could be seen weaving in and out of traffic, running multiple stop signs and stop lights, and, at one point, traveling in the opposite lane into oncoming traffic.

### Sergeant Mason Hammond

{¶ 13} Bryan Police Sergeant Mason Hammond was within the Bryan city limits when he received a call through dispatch that Amador was in a vehicle pursuit and that Amador had visually identified appellant as the driver of the vehicle. Hammond received confirmation through the Defiance County dispatch center that appellant did have an active warrant for his arrest. Amador had advised that appellant was driving a Ram 1500 and that he was not stopping. Hammond began heading in the direction of Amador's location.

{¶ 14} Hammond was approximately a half mile to a mile behind Amador during the chase. He was finally able to catch up to Amador when he reached the parking lot in Blakeslee.

5.

{¶ 15} After Hammond and Amador checked and cleared appellant's truck, Amador went to check the railroad tracks and Hammond went to check outbuildings and stacks of material that were outside of a nearby supply store. Amador then called Hammond to assist him.

{¶ 16} Both Amador and Hammond gave appellant multiple commands to show his hands, stop moving, and stop running, but appellant ignored these directives. The officers physically restrained appellant and placed him on the ground, where appellant continued to resist. Once detained, appellant, who was complaining of health issues, was taken to an area hospital to be cleared for incarceration.

**Gary Merschdorf**

{¶ 17} Witness Gary Merschdorf, a former deputy sheriff, testified that on February 24, 2023, he was working at Moore Electronics, in Blakeslee, Ohio, and was listening to radio traffic on a police scanner, when he overheard that the Bryan Police Department was attempting to stop a vehicle that was being pursued near his location. Merschdorf stated that he went outside and saw the pursued vehicle run a stop sign as it headed into town. He said that he saw the vehicle swerve left of center over into a parking area where other vehicles, including Merschdorf's vehicle, were parked. The vehicle then swerved back out into the roadway, where it continued northbound until, finally, it turned left onto a side street. About 30 seconds later, when the officers came around a corner and began traveling northbound, Merschdorf directed them to head down the side street, towards the last known location of the vehicle.

6.

**Appellant's Case-in-Chief**

{¶ 18} After the State rested its case, the defense called two witnesses, including appellant, who testified as follows.

**Appellant**

{¶ 19} Appellant testified that on February 24, 2023, he went to a friend's house, which was known for criminal activity in the past, in order to sell somebody -- a "friend of a friend" -- a truck that his mother was supposed to be leaving him in her estate. Appellant only knew the prospective buyer as "AJ." According to appellant, AJ was about appellant's height, had skin just a little bit darker than appellant's, and, like appellant, had a tattoo on the side of his face.

{¶ 20} Appellant testified that he was intending to sell his truck, a truck that would "easily" retail for $30,000 - $40,000, for $10,000. He stated that he had a quick conversation with AJ, after which he and AJ decided to take the truck for a test drive. They hurried into the truck because they noticed that a law enforcement officer was circling the block. Appellant stated that he helped AJ start the truck and then -- after advising AJ that he had a warrant -- quickly scooted into a crouched position in the passenger seat floorboard. Appellant said that he told AJ not to get them pulled over, and that AJ told him that he, too, had a warrant out.

{¶ 21} Appellant testified that although he was in a crouched position on the floorboard and kept his head lower than the window throughout the chase, he was aware that police lights and sirens were activated, and he knew that police were in pursuit while

7.

the vehicle was being operated all over the roads and in a "reckless manner." Appellant asserted that it sounded like AJ was "maxing the truck out," and going "top speed." He further stated that he yelled at AJ to stop multiple times.

{¶ 22} Appellant claimed that at the end of the pursuit, he saw the figure of AJ's body "disappear out of the driver seat while the truck was still rolling," and so he dove from his crouched position on the passenger floorboard to hit the brake with his hand in order to stop the truck. Appellant stated that he then moved his body "all the way around" into a seated position so that he could put his foot on the brake and then park the vehicle. Appellant stated that he got out of the truck and, seeing AJ running through the trees, ran in another direction.

{¶ 23} Appellant heard officers tell him multiple times to stop. He did not immediately stop due to purported heart issues that he was experiencing, as well as being scared and confused. He stopped fleeing once he heard the arc of a taser, but, due to his heart problems, continued giving officers a hard time while they were trying to detain him.

**Cheryl Biggly**

{¶ 24} Cheryl Biggly testified that she was engaged to appellant. She stated that on February 24, 2023, she met appellant at a friend's house, but she did not know that there was a possibility that the truck might be sold that day. She said that she saw appellant and a guy that appellant was talking to get into the truck, and that she was told to get into her car and to follow the truck, but she was not told why. Biggly testified that

8.

initially followed the truck, but then turned down a side road as an officer was following her, because she thought she had forgotten her wallet. Biggly asserted that she was on the phone with appellant during this time.

{¶ 25} Biggly testified that once she turned down the side road and stopped following appellant, she realized her wallet was actually in the car. She started to head back to where appellant had been, when she saw apellant's truck drive by. She claims that she did not see appellant in the driver's seat and did not see anyone in the passenger's seat. Biggly asserted that she was on the phone with appellant throughout the entirety of the pursuit and was mainly listening on her end. Biggly asserts she told the driver to pull over, but he would not listen to her.

### Sentencing

{¶ 26} At sentencing, the trial court stated on the record that it had received and reviewed the pre-sentence investigation report. In addition, the trial court heard from the prosecutor, defense counsel, and appellant.

{¶ 27} The presentence report indicated that appellant had been in two prior high-speed chases with police. The first one was in 2006 and resulted in appellant's conviction for fleeing and eluding police. The second was in 2018 and resulted in appellant's conviction for failure to comply with an order or signal of a police officer, where it was alleged that appellant had accelerated to approximately 100 miles per hour after the officer activated his lights and siren and did not stop the motor vehicle for approximately three miles.

9.

**{¶ 28}** The prosecutor stated that in the current case, appellant was unwilling to accept responsibility for his actions in fleeing from police, and that the high-speed chase put many lives in danger as appellant sped and swerved through traffic on the day in question. The prosecutor also discussed appellant's long criminal history, which began in 2000 and continued to the present offense, which appellant committed while on community control.

**{¶ 29}** Defense counsel spoke of appellant's unfortunate history, the fact that he had a tough time growing up, and that he was taking steps to do better.

**{¶ 30}** Finally, the trial court heard from appellant, who discussed his rough childhood, medical problems, and efforts to change his life. When the trial court pointed out a lack of remorse -- noting that appellant was apologizing only for being in the passenger seat, down on the floor, begging the driver of the vehicle to stop -- appellant stated, "No matter how you look at it, Your Honor, if I hadn't have been there that day in my addiction, trying to sell the truck and trying to do the wrong things, I would have never been in that situation for that to even take place in anybody's life….And I do have remorse for that, Your Honor."

**{¶ 31}** After hearing from the parties, the trial court stated that it had considered both the R.C. 2929.11 purposes of felony sentencing and the factors enumerated under R.C. 2929.12. After finding that Count One and Count Two merged for purposes of sentencing, the trial court stated that, despite appellant's challenges and efforts to make

10.

better decisions, it could not ignore the facts of the indictment and the events that had occurred. Specifically, the trial court stated:

> Just like the jury, I sat here and watched the video tape of the chase and a lot of people's lives, including your own, were put at risk. The officers involved, the citizens of the county. What the jury said you did was a very serious offense. Therefore I cannot find that you are amendable to a community control sanction.

Thereafter, the trial court ordered appellant to serve 30 months at the Ohio Department of Rehabilitation and Correction. In addition, the trial court imposed a Class Two driver's license suspension of a minimum of three years, and a period of discretionary post-release control of up to two years.

### Assignments of Error

{¶ 32} On appeal, appellant asserts the following assignments of error:

I. The jury finding that appellant caused a substantial risk of serious physical harm is against the manifest weight of the evidence.

II. Appellant's sentence is clearly and convincingly unsupported by the record.

## Law and Analysis

## First Assignment of Error

{¶ 33} Appellant argues in his first assignment of error that his conviction was against the manifest weight of the evidence because his actions did not put anyone at risk of serious physical harm.

## Manifest Weight of the Evidence

{¶ 34} "When considering whether a conviction was against the manifest weight of the evidence, an appellate court 'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Pitts,* 2022-Ohio-643, ¶ 21 (6th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). (Additional citation omitted.) "The reviewing court sits 'as a "thirteenth juror" and may disagree with the fact-finder's resolution of the conflicting testimony.'" *Id.*, quoting *State v. Stein*, 2021-Ohio-761, ¶ 34 (6th Dist.), citing *Thompkins* at 387. "However, we will 'extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities

12.

such as hesitancy, equivocation, and candor.'" *Id.,* quoting *State v. Beavogui*, 2018-Ohio-2432, ¶ 55 (6th Dist.).

## R.C. 2921.331

{¶ 35} Under R.C. 2921.331(B), "[n]o person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop." A violation of that section is a first-degree misdemeanor unless (C)(4) or (5) applies. Appellant was convicted under (C)(5)(a)(ii). Under this section, a violation of R.C. 2921.331(B) is a third-degree felony if the trier of fact finds that "[t]he operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property." R.C. 2921.331(C)(5)(a)(ii). A "'[s]ubstantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

{¶ 36} "Ohio courts hold that 'it is irrelevant to the enhancement whether appellant *actually* caused or almost caused serious physical harm to persons or property.'" *State v. Owens*, 2022-Ohio-2908, ¶ 27 (6th Dist.), quoting *State v. Garrard*, 2007-Ohio-1244, ¶ 45 (10th Dist.). "These courts emphasize that 'the failure of Appellant to engage in a "near collision" speaks to nothing more than Appellant's good luck and the careful driving on the part of other motorists on the road' and 'is irrelevant' to the level of risk that the appellant's conduct created." *Id.,* citing *State v. Love*, 2004-Ohio-1422, ¶ 19 (9th Dist.).

13.

**{¶ 37}** On the other hand, "Ohio appellate courts have repeatedly held that high-speed chases inherently create a substantial risk of physical harm to the driver, officers, and other motorists on the road, since high speeds increase the likelihood and severity of crashes." *State v. Johnson,* 2023-Ohio-30, ¶ 44 (6th Dist.), citing *Owens* at ¶ 22-32; *State v. Jefferson*, 2019-Ohio-156, ¶ 59 (5th Dist.), *State v. Scott,* 2013-Ohio-4599, ¶ 22 (8th Dist.), *State v. Sanders,* 2008-Ohio-1126, ¶ 29 (11th Dist.).

**{¶ 38}** Here, the record – which contains largely-uncontroverted police officer testimony (only appellant's identity as the driver was contested) together with wholly uncontroverted dash camera video -- shows that appellant drove his vehicle at an extremely high rate of speed – in excess of 100 miles per hour in zones marked 55 miles per hour or less – while weaving between and around other vehicles and traveling into oncoming traffic. The record further shows that appellant ran multiple stop signs and stop lights at high rates of speed, through both residential and rural areas. Thus, the jury had abundant credible evidence upon which to find that appellant's actions and the operation of his motor vehicle created a substantial risk of serious physical harm to appellant, to the officers, and to other motorists on the roadway. This is not the exceptional case in which the evidence weighs heavily against the conviction.

**{¶ 39}** Arguing against this conclusion, appellant suggests that because the officers did not break off the pursuit, there was no evidence of a substantial risk of harm. This court has previously rejected such a claim. *See Owens*, 2022-Ohio-2908, ¶ 32 (6th Dist.) (finding: (1) that the appellant pointed to no evidence in the record showing that

14.

the pursuit – while sufficiently dangerous to create a substantial risk of harm – was so dangerous that officers were required to abandon their pursuit; and (2) that appellant cited no case law or other authority showing that the two positions are so synonymous that one cannot exist without the other).

{¶ 40} For all of the foregoing reasons, appellant's first assignment of error is found not well-taken.

## Second Assignment of Error

{¶ 41} Appellant argues in his second assignment of error that his sentence of 30 months incarceration "does not fulfill the principles and purposes of sentencing as it is disproportional to appellant's actions and is an unnecessary use of government resources," which shows that the court did not properly consider the factors in R.C. 2929.11 and 2929.12. The state points out in response that *State v. Jones*, 2020-Ohio-6729, precludes this court from reviewing the trial court's consideration of R.C. 2929.11 and 2929.12.

{¶ 42} In general, we review sentencing challenges under R.C. 2953.08(G)(2). *State v. Eames*, 2024-Ohio-183, ¶ 9 (6th Dist.). "The statute allows us to increase, reduce, or otherwise modify a sentence or vacate the sentence and remand the matter for resentencing only if we clearly and convincingly find either (1) the record does not support the trial court's findings under specified Revised Code sections not at issue here, or (2) the sentence is otherwise contrary to law." *Id.*, citing R.C. 2953.08(G)(2)(a)-(b).

15.

**{¶ 43}** R.C. 2953.08(G)(2) does not, however, permit an "'appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12.'" *State v. Bowles*, 2021-Ohio-4401, ¶ 7 (6th Dist.), quoting *Jones* at ¶ 42. "Moreover, we may summarily dispose of an assignment of error that is based only on the trial court's consideration of the factors in R.C. 2929.11 and 2929.12." *Eames* at ¶ 10, citing *Bowles* at ¶ 8, citing *State v. Toles*, 2021-Ohio-3531, ¶ 1.

**{¶ 44}** Appellant's only arguments under this assignment of error seem to relate to the trial court's consideration of the factors in R.C. 2929.11 and 2929.12, which we cannot review.

**{¶ 45}** To the extent that appellant's arguments go beyond the R.C. 2929.11 and 2929.12 factors, we note that R.C. 2921.331(C)(5)(b) outlines additional factors that a sentencing court must consider when determining the seriousness of an offender's conduct in committing a violation of R.C. 2921.221(B), specifically:

> (i) The duration of the pursuit;
>
> (ii) The distance of the pursuit;
>
> (iii) The rate of speed at which the offender operated the motor vehicle during the pursuit;
>
> (iv) Whether the offender failed to stop for traffic lights or stop signs during the pursuit;
>
> (v) The number of traffic lights or stop signs for which the offender failed to stop during the pursuit;

(vi) Whether the offender operated the motor vehicle during the pursuit without lighted lights during a time when lighted lights are required;

(vii) Whether the offender committed a moving violation

during the pursuit;

(viii) The number of moving violations the offender

committed during the pursuit;

(ix) Any other relevant factors indicating that the offender's conduct is more serious than conduct normally constituting the offense.

Notably, a sentencing court is not required to state its consideration of the R.C. 2921.331(C)(5)(b) statutory factors on the record, nor is it required to make any specific findings in relation thereto. *State v. Webster*, 2023-Ohio-2637, ¶ 20 (9th Dist.); *see also State v. Wingate*, 2020-Ohio-6796, ¶ 23 (3d Dist.).

{¶ 46} In the current case, we find that because the trial court was present for the officer Amador's testimony and saw Amador's dash camera video -- both of which clearly provided evidence relating to the R.C. 2921.331(C)(5)(b) factors -- and because the trial court expressly referenced the video at the sentencing hearing, we conclude that the trial court did consider the R.C. 2921.331(C)(5)(b) factors in its determination of appellant's sentence. *See State v. Farr*, 2023-Ohio-4704, ¶ 20 (3d Dist.) (where trial court (1) was present for officer testimony, including admission of dash-cam videos, and (2) referenced videos at sentencing hearing, trial court was found to have considered R.C. 2921.331(C)(5)(b) factors). Thus, the trial court's sentence was not contrary to law under

17.

R.C. 2921.331(C)(5)(b). Appellant's second assignment of error is, therefore, found not well-taken.

## Conclusion

**{¶ 47}** For all of the foregoing reasons, the judgment of the Williams County Court of Common Pleas is affirmed. Appellant is to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                          _____
                                                                JUDGE

Myron C. Duhart, J.

                                                        _____
Charles E. Sulek, P.J.                                          JUDGE
CONCUR.

                                                        _____
                                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.